# OUNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| VICKI PEPPER | * | CIVIL ACTION NO. 15-2830 |
| --- | --- | --- |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| MUTUAL OF OMAHA INSURANCE CO. | * | MAG. JUDGE KAREN L. HAYES |

## RULING

This is a dispute over a denial of accidental death insurance benefits. Defendant Mutual of Omaha Insurance Co. ("Mutual of Omaha") issued a policy of insurance to Kenneth A. Pepper ("Mr. Pepper") in 2008. When he died in 2014, Mutual of Omaha denied payment to Mr. Pepper's wife and beneficiary, Plaintiff Vicki Pepper ("Mrs. Pepper").

Pending are cross-motions for summary judgment filed by Mrs. Pepper [Doc. No. 30] and Mutual of Omaha [Doc. No. 32]. For the following reasons, Mutual of Omaha's Motion for Summary Judgment is GRANTED, and Mrs. Pepper's Motion for Summary Judgment is DENIED.

## I. FACTS AND PROCEDURAL HISTORY

Mr. Pepper purchased an Accidental Death Insurance Policy No. E428ADR41-928667-27M ("the Policy") from Mutual of Omaha with an effective date of July 26, 2008.[1] The Policy listed Mrs. Pepper as beneficiary. [Doc. No. 30, Exh. A]. Mr. Pepper made premium payments of $8.95 per month for the Policy, which provided coverage only for "Accidental Death." Under the Policy,

---

[1] Mr. Pepper did not purchase a life insurance policy from Mutual of Omaha.

benefits were to be paid in the case of three classes of accidental death: (1) Class 1 provided for benefits of $750,000.00 in the event of a common carrier or scheduled airline injury, (2) Class 2 provided for benefits of $225,000.00 in the event of private automobile or pedestrian injury, and (3) Class 3 provided for benefits of $150,000.00 in the event of all other unspecified "injuries sustained in a manner not specified under Class 1 or Class 2 and not otherwise excluded under the policy." [Doc. No. 30, Exh. B, pp. 1-2]. "Injury" is defined as

> bodily harm which:
>
> (a) is the direct result of an accident or trauma that occurs while your policy is in force; and
>
> (b) results in loss independently of sickness and all other causes (except for sickness caused by the injury).

*Id.* at p. 1.

Mr. Pepper had a history of medical conditions and treatments, which included arthritis, congestive heart failure, gastrointestinal bleeding, heart disease, heart stents, heart pacemaker, high cholesterol, atrial fibrillation, gout, and diverticulitis. Mr. Pepper had also suffered from peptic ulcer disease since he was a teenager.

In 2014, Mr. Pepper's gastroenterologist, Dr. Brian Levantino, diagnosed him with peptic ulcer disease with gastric outlet obstruction. During this time, Mr. Pepper lost twenty-seven pounds in three weeks. Dr. Levantino referred Mr. Pepper to Dr. Walter Sartor, a general surgeon.

Dr. Sartor determined that surgery was necessary. Without surgery, Mr. Pepper would not have been able to eat and "probably" would have died of malnutrition. [Doc. No. 32-6, Sartor Depo., p. 14].

On May 6, 2014, at St. Francis Hospital in Monroe, Ouachita Parish, Louisiana, Mr. Pepper

had surgery. He was first placed under general anesthesia, and then Dr. Sartor performed a laparoscopic truncal vagotomy, antrectomy with Billroth-II anastomosis.[2] Dr. Sartor successfully removed the gastric outlet obstruction.

Mr. Pepper remained in the hospital after surgery. Two days later, he developed tremors and had a temperature of 102.8. On May 12, 2014, he was diagnosed with adult respiratory distress syndrome or "ARDS," which is an "inflammation in the lungs that . . . create[s] a tremendous amount of swelling in the membranes between the blood vessels and the airways where oxygen and $CO_2$ [are] exhanged, and the lungs can't make that exchange because the membrane becomes too thick." [Doc. No. 32-6, Sartor Depo., pp. 26-27]. Respiratory compromise is a known risk of any

---

[2]Dr. Sartor testified at his deposition that this surgery entailed

> putting a laparoscope in, inflating the abdomen with $CO_2$, dissecting up around where the esophagus meetings stomach, on the upper part of the stomach, cutting the nerves. There are two nerves that go around the stomach; one serves the front party of the stomach, the other serves the back wall of the stomach. And you divide them, take a little piece out, send it to pathology to confirm that you've divided the structure in question, and that shuts down acid production from the neurologic influence, or the neurologic influence of acid production. And then the lower half to two-thirds of the stomach is removed from a certain landmark that you look for on the upper part and then just beyond where the stomach ends. In his case, I went down to below where the ulcer was resected from just beyond the ulcer to the mid portion of the stomach basically, and we removed that. And when you do that, you remove the hormonal influence of acid production in the stomach, theoretically shutting down all acid production in the upper GI tract, and "cure" the patient's ulcer, what we call diathesis, or process. . . . The most common way to do it . . . is what's called a Billroth II anastomosis. An anastomosis is a connection from one structure to another that you create. And you bring up a loop of intestine and you make a small hole in it and a small hole in the back wall of your stomach pouch, insert a stapler in and connect the two, and then you sew up the opening with a suture. And that's a laparoscopic Billroth II anastomosis.

[Doc. No. 32-6, Sartor Depo., pp. 13-14].

3

surgery, but not particular to the type of surgery Mr. Pepper had, and Dr. Sartor did not expect this development. [Doc. No. 32-6, Sartor Depo., pp. 25-26]. However, his development of ARDS was related "in some way" to his surgery because he would not have developed ARDS just "sitting at home." [Doc. No. 32-6, Sartor Depo., p. 27]. According to Dr. Sartor, Mr. Pepper's death had to be "related" to the surgery or anesthesia in "some way, shape, or form." [Doc. No. 32-6, Sartor Depo., pp. 62-63].

Because of his respiratory distress, Mr. Pepper was placed on a ventilator. Mr. Pepper's condition continued to deteriorate.[3] When it became apparent he would not survive even with intubation, Mr. Pepper was extubated, and he died at 9:30 a.m. on May 31, 2014, at the age of sixty. Dr. Sartor prepared the original death certificate, listing his cause of death as a "natural" death arising from complications from surgery.

Mrs. Pepper filed a claim with Mutual of Omaha under the Accidental Death Policy and provided a copy of the death certificate. After reviewing the medical records and death certificate, Mutual of Omaha denied the claim, finding that it was not a covered loss.

After the claim was denied, approximately two and one-half months after Mr. Pepper's death, Mrs. Pepper asked Dr. Sartor to change the cause of death on the death certificate from natural to accidental. Dr. Sartor prepared a letter to this effect, but could not change the cause of death under State law. However, Dr. Sartor testified that he did not lie that the cause of death was natural. [Doc. No. 32-6, Sartor Depo., pp. 75, 79].

Mrs. Pepper then requested that Dr. Joel Eldridge, the coroner for Franklin Parish, change the death certificate. The Peppers resided in Franklin Parish at the time of Mr. Pepper's death,

---

[3]Mr. Pepper developed a lung infection which may have been viral pneumonia.

although Mr. Pepper died in Ouachita Parish. Dr. Eldridge was also Mrs. Pepper's personal physician.

After reviewing the medical records, Dr. Eldridge sent a letter to the State in which he requested that the nature of the death on the death certificate be changed from "natural" to "accidental" because of "unforeseen complications from general anesthesia associated with GI surgery." [Doc. No. 32-8, Elridge Depo., pp. 53-54]. Dr. Elridge used a definition he found in U.S. Legal Definitions from California to determine that the death was accidental. [Doc. No. 32-8, Eldridge Depo., p. 47, Exhs. 7 & 9]. However, Dr. Eldridge testified that Mr. Pepper's surgery required the use of general anesthesia, that the most likely cause of the ARDS development was related to the general anesthesia, and that he could not say that Mr. Pepper's death was independent of sickness and other causes because the general anesthesia "contributed" to his death. [Doc. No. 32-8, Eldridge Depo., pp. 37, 43; *see also* Doc. No. 32-8, Eldridge Depo., pp. 43-43 ("what happened" to Mr. Pepper was "an unforeseen side effect or consequence to the anesthesia.")]. Dr. Eldridge testified that he did not consider Mr. Pepper's death to be independent of the general anesthesia which was required to perform the gastrointestinal surgery. [Doc. No. 32-8 , Eldridge Depo., p. 43]. Dr. Eldridge admitted that, in requesting that the State change the death certificate, he never relied upon the terms and conditions of the Policy. [Doc. No. 32-8, Eldridge Depo., p. 41].

On November 24, 2015, Mrs. Pepper filed a Petition in the Fifth Judicial District Court for the Parish of Franklin, State of Louisiana, claiming Mutual of Omaha wrongfully denied her claim because Mr. Pepper's death was due to accidental causes. [Doc. No. 1-4]. The matter was removed to this Court on December 15, 2015. [Doc. No. 1].

Following removal to this Court, the parties filed cross motions for summary judgment,

which are fully briefed, and the Court is now prepared to rule.

**II.     LAW AND ANALYSIS**

   **A.     Standard of Review**

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242,

248 (1986)).

In a bench trial, "a district court has somewhat greater discretion to consider what weight it will accord the evidence." *In re Placid Oil Co.*, 932 F.2d 394, 397 (5th Cir.1991). A court "has the limited discretion to decide that the same evidence, presented to him or her as a trier of fact in a plenary trial, could not possibly lead to a different result." *Id.* at 398 (citing *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir.1978)).

### B. Motion for Summary Judgment

Mrs. Pepper moves the Court for summary judgment, contending that the surgery was successful in removing Mr. Pepper's gastric outlet obstruction, so his death was not caused by his sickness, but was an accident or trauma caused by the surgeon, Dr. Sartor, or the anesthesiologist. Mutual of Omaha opposes Mrs. Pepper's Motion for Summary Judgment and moves the Court for summary judgment in its favor. Mutual of Omaha argues that it properly denied Mrs. Pepper's claim because Mr. Pepper's death was not independent of his sickness and all other causes.

Because the Court is sitting in diversity, the Court applies the substantive law of Louisiana, the forum state. *See, e.g., Holt v. State Farm Fire & Caves. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. Co. v. Tomiki*, 304 U.S. 64 (1938)).

Under Louisiana law, "[w]hen determining whether a policy affords coverage for an incident, the insured bears the burden of proving the incident falls within the policy's terms." *Beck v., Burgeon*, No. 43,557-CA (La. App. 2 Cir. 2008), 996 So.2d 404, 408-09 (citations omitted). However, as a corollary to this statement of law, "[a]n insurer seeking to avoid coverage through summary judgment bears the burden of proving some provision or exclusion applies to preclude coverage." *Id.* at 409. In this case, the parties have filed cross-motions for summary judgment,

7

indicating that the case is ripe for resolution on the record.

An insurance policy is a contract and is subject to the general rules of contract interpretation prescribed in the Louisiana Civil Code. *See Succession of Faunal v. Lafayette Ins. Co.*, 2001-1144 (La. 1/15/02), 805 So.2d 1134, 1135; *Marcus v. Hanover Ins. Co., Inc.*, 98-2040 (La. 6/4/99), 740 So.2d 603, 606. Applying those rules, courts must attempt to discern the common intent of the insured and insurer. *See* LA. CIV.CODE ART. 2045. "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art.2046. However, any ambiguity in an insurance policy "must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n v. Interstate Fire & Caves. Co.*, 630 So.2d 759, 763 (La.. 1994) (citing LA. CIV. CODE ANN. ART. 2050 )). "Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract." LA. CIV. CODE ART. 2048. "Ambiguity may also be resolved through the use of the reasonable-expectations doctrine-i.e., 'by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered.'" *La. Ins. Guar. Ass'n*, 630 So.2d at 764 (quoting *Breland v. Schilling*, 550 So.2d 609, 610-11 (La. 1989)).

If, after these rules are applied, ambiguity remains, the courts will construe the ambiguity against the insurer who prepared the insurance contract's text and in favor of the insured. *See* LA. CIV.CODE ART. 2056; *Succession of Faunal*, 805 So.2d at 1135. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." *Tex. E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir.1998). Absent a conflict with statutory provisions or public policy, the

8

insurance policy must be enforced as it is written. *See Marcus*, 740 So.2d at 606.

The Court looks to the language of the Policy. The Policy provides benefits when the insured suffers an "injury," which is defined as "bodily harm which: (a) is the direct result of an accident or trauma that occurs while your policy is in force; and (b) results in loss independently of sickness and all other causes (except for sickness caused by the injury)." [Doc. No. 30, Exh. B].

Mrs. Pepper argues that Mr. Pepper suffered "bodily harm" in the form of ARDS which caused his ultimate injury, i.e., his death. Since the purpose of the surgery, removal of the gastric outlet obstruction was successful, she argues that the development of ARDS from the administration of anesthesia was an accident or trauma independent of the cause for the surgery. The Policy does not define "accident," so Mrs. Pepper argues that the Court should apply dictionary definitions of the word to find that it is an "unexpected" event. Drs. Sartor and Eldrige both testified that his development of ARDS was not and should not have been expected from the surgery, and, therefore, she argues that she is entitled to payment of benefits.

However, even if the Policy is ambiguous in using the undefined term "accident" as part of the definition for injury, the Policy requires a two-pronged showing. Not only must the harm be the direct result of an accident or trauma, but it must also be independent of sickness and all other causes. The second part of the definition is not ambiguous, Mrs. Pepper cannot make this showing, and Mutual of Omaha properly denied benefits under the facts and circumstances of this case.

It is undisputed that Mr. Pepper was admitted to the hospital for surgery for a gastric outlet obstruction that resulted from his peptic ulcer disease, he developed complications two days later, and he died without ever leaving the hospital. Two doctors, Mr. Pepper's surgeon and the coroner for his parish of residence, opine that he died from complications from the general anesthesia he was

9

necessarily given for surgery.[4] Mutual of Omaha relies on an opinion from its expert/employee, Dr. Thomas Reeder, Senior Vice President and Medical Director for Mutual of Omaha, who agreed that Mr. Pepper developed ARDS, but disagreed that anesthesia was the sole cause of this development. [Doc. No. 32-10, Reeder Depo., p. 75]. He opines that Mr. Pepper "had multiple sicknesses that contributed to his death[,]" that he "underwent a surgical procedural specifically for gastric outlet obstruction and developed some of the postoperative complications described in the consent form." [Doc. No. 30, Exh. K, Reeder Report]. Specifically, Dr. Reeder believes that Mr. Pepper had a post-surgical complication of sepsis that caused him to develop ARDS and that there were other contributing causes that were stressors on his system. [Doc. No. 32-10, Reeder Depo., pp. 67, 74-75; Doc. No. 30, Exh. K, Reeder Report]. Regardless, however, whether Mr. Pepper developed ARDS because of the necessary use of anesthesia or because of sepsis and/or other contributing conditions, his injury (death) was not independent "of sickness and all other causes (except for sickness caused by the injury)," but was proximately caused by the surgery for his obstruction. Even if at trial the Court were to credit the opinions of Drs. Sartor and Elridge over that of Dr. Reeder and found that Mr. Pepper died of complications from the administration of anesthesia necessary to his surgery, his death simply was not an injury caused independently of his sickness and all other causes.[5] *Cf. Duhon*

---

[4] The Court has included the facts concerning the rendering of Mr. Pepper's death certificate as part of the history of the case and as having some marginal relevance, but the findings by Dr. Sartor on the original death certificate and by Dr. Eldrige on the amended death certificate are not dispositive. Neither doctor applied the Policy definition to make his determination as to the cause of death.

[5] The Court's interpretation is also consistent with the plain language of the exclusions section of the Policy which clearly excludes payment of benefits for any "loss" resulting "directly **or indirectly** from disease or bodily infirmity." [Doc. No. 30, Exh. B, pp. 2-3 (emphasis added)]. Mr. Pepper's peptic ulcer disease and resulting obstruction, at the very least, indirectly caused his death.

*v. Colonial Life and Accident Ins. Co.*, No. 4095 (La. App. 3 Cir. 05/24/73), 277 So.2d 234 (benefits were payable under the terms of an accident policy when the insured suffered a simple fracture of the tibia in a fall while dancing (an accident), but during treatment for the injury developed a bacterial infection resulting in amputation of the leg and resulting disability).

### III. CONCLUSION

The Court has great sympathy for Mrs. Pepper in the loss of her husband. However, Mr. Peppers did not purchase a life insurance policy, but an accidental death policy. Applying the terms of the Policy, the Court has concluded that Mutual of Omaha properly denied benefits because Mr. Pepper's death was not an "injury" as defined. Mutual of Omaha's Motion for Summary Judgment [Doc. No. 32] is GRANTED, and Mrs. Pepper's Motion for Summary Judgment [Doc. No. 30] is DENIED. Mrs. Pepper's claims are DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this 13th day of April, 2017.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE